So Ordered.

Signed this 14 day of July, 2026.



_____

Patrick G. Radel
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 7 |
| KRIS DANIEL ROGLIERI, | Case No. 24-10157-1-pgr |
| Debtor. | |
| 1800 PARK AVENUE LLC, | Adv. Pro. No. 24-90008-1-pgr |
| Plaintiff, | |
| v. | |
| PRIME COMMERCIAL LENDING, LLC, PRIME CAPITAL VENTURES, LLC, KRIS DANIEL ROGLIERI, KIMBERLY A. HUMPHREY a/k/a KIMMY HUMPHREY, ERIK MARTIN, SCOTT DIBERARDINIS, | |
| Defendants. | |

**ORDER ISSUING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON THE FOURTH CLAIM FOR RELIEF,
RECOMMENDING ENTRY OF DEFAULT JUDGMENT BY THE DISTRICT COURT,
AND DIRECTING SERVICE AND TRANSMITTAL OF THE RECORD PURSUANT TO
<u>28 U.S.C. § 157(c)(1), FED. R. BANKR. P. 9033, AND LBR 7055-1(d)(2)</u>**

1

Upon the motion (Adv. Doc. No. 33) (the "Motion") of Plaintiff 1800 Park Avenue LLC ("Plaintiff") for, among other things, issuance of proposed findings of fact and conclusions of law on the Fourth Claim for Relief of the Complaint (civil RICO, 18 U.S.C. §§ 1962(c), 1964(c)) and a recommendation that the United States District Court for the Northern District of New York (the "District Court") enter default judgment thereon, pursuant to 28 U.S.C. § 157(c)(1), Federal Rules of Bankruptcy Procedure 7055 and 9033, and Local Bankruptcy Rule 7055-1(d)(2); and upon the Declaration of Chad P. Miesen, Esq. and the exhibits thereto, and the Memorandum of Law submitted in support of the Motion; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY FINDS, pursuant to Local Bankruptcy Rule 7055-1(d)(2)(D), that:

a.      the summons and Complaint were timely and properly served upon Defendant Kris Daniel Roglieri ("Defendant") in accordance with Federal Rule of Bankruptcy Procedure 7004 on April 10, 2024;

b.      the time within which Defendant was required to answer or otherwise respond to the Complaint has passed;

c.      no answer or other pleading has been filed by Defendant, and the Clerk entered Defendant's default on July 18, 2025 (Adv. Doc. No. 29);

d.      the Fourth Claim for Relief is a non-core proceeding otherwise related to a case under title 11, and Defendant — who has never answered, formally appeared, or filed the statement required by Federal Rule of Bankruptcy Procedure 7012(b) — has not knowingly and voluntarily consented to the entry of final judgment by this Court, such that any final judgment on the Fourth Claim for Relief must be entered by the District Court pursuant to 28 U.S.C. § 157(c)(1); and

2

e.      for the reasons set forth in the proposed findings of fact and conclusions of law issued herewith, it is RECOMMENDED that the District Court enter default judgment in favor of Plaintiff and against Defendant on the Fourth Claim for Relief.

NOW, THEREFORE, it is hereby

ORDERED, that the Court hereby issues its Proposed Findings of Fact and Conclusions of Law on the Fourth Claim for Relief, annexed hereto as Exhibit 1 (the "Proposed Findings"), pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033, and recommends that the District Court adopt the Proposed Findings and enter default judgment in favor of Plaintiff and against Defendant on the Fourth Claim for Relief as set forth therein; and it is further

ORDERED, that, pursuant to Federal Rule of Bankruptcy Procedure 9033(a), the Clerk shall promptly serve a copy of this Order and the Proposed Findings, by mail, on every party — including Defendant at his address of record and at FCI Danbury (Federal Correctional Institution, Route 37, Danbury, CT 06811) where he is currently incarcerated — and shall note the date of mailing on the docket; and it is further

ORDERED, that, within 14 days after being served, a party may file with the Clerk and serve written objections that identify each proposed finding or conclusion objected to and state the grounds for the objection, and a party may respond to another party's objections within 14 days after being served with a copy, all in accordance with Federal Rule of Bankruptcy Procedure 9033(b); and it is further

ORDERED, that, upon the expiration of the objection period (and any response period), the Clerk shall transmit to the Clerk of the District Court this Order, the Proposed Findings, any objections and responses thereto, and ~~the record of this adversary proceeding~~ any other required PGR documents, for the opening of a civil matter, assignment to a district judge, de novo review

3

of any matters to which timely and specific objection has been made, and entry of final judgment

on the Fourth Claim for Relief in accordance with 28 U.S.C. § 157(c)(1) and Federal Rule of

Bankruptcy Procedure 9033(c)(d); and it is further

PGR

ORDERED, that Plaintiff may apply to the District Court for entry of judgment in

accordance with the Proposed Findings following transmittal of the record.

###

EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:*<br><br>KRIS DANIEL ROGLIERI,<br><br>                       Debtor. | Chapter 7<br><br>Case No. 24-10157-1-pgr |
| 1800 PARK AVENUE LLC,<br><br>                       Plaintiff,<br><br>v.<br><br>PRIME COMMERCIAL LENDING, LLC,<br>PRIME CAPITAL VENTURES, LLC, KRIS<br>DANIEL ROGLIERI, KIMBERLY A.<br>HUMPHREY a/k/a KIMMY HUMPHREY,<br>ERIK MARTIN, SCOTT DIBERARDINIS,<br><br>                       Defendants. | Adv. Pro. No. 24-90008-1-pgr |

**PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION**
**FOR DEFAULT JUDGMENT AGAINST DEFENDANT KRIS DANIEL ROGLIERI**

Before the Court is the motion of Plaintiff 1800 Park Avenue LLC ("Plaintiff") for entry

of default judgment pursuant to Federal Rule of Civil Procedure 55(b), made applicable to this

1

EXHIBIT 1

adversary proceeding by Federal Rule of Bankruptcy Procedure 7055, against Defendant Kris Daniel Roglieri ("Defendant" or "Roglieri"), the debtor in the above-captioned chapter 7 case and the sole remaining defendant in this adversary proceeding. Plaintiff seeks (i) a money judgment on its Fourth Claim for Relief under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), and (ii) a determination on its Fifth Claim for Relief that Defendant's debt to Plaintiff is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

The Fifth Claim for Relief seeks a determination of the dischargeability of a particular debt and is therefore a core proceeding upon which this Court may enter a final judgment. 28 U.S.C. § 157(b)(2)(I). The Fourth Claim for Relief, however, is a non-core claim arising under a federal statute outside title 11, and Defendant — who did not appear in this adversary proceeding until the July 8, 2026 hearing on the motion, and then only to request additional time to respond — has not knowingly and voluntarily consented to the entry of final judgment by this Court. Accordingly, with respect to the Fourth Claim for Relief, the Court submits the following proposed findings of fact and conclusions of law to the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033, and respectfully recommends that the District Court enter final judgment in favor of Plaintiff as set forth below. The findings and conclusions set forth herein also support the separate final judgment this Court will enter on the Fifth Claim for Relief.

The proposed findings of fact set forth below are established by two independent and mutually reinforcing sources: (1) the well-pleaded factual allegations of the Complaint, which are deemed admitted by reason of Defendant's default; and (2) the facts admitted by Defendant in,

and necessarily determined by, his criminal conviction in *United States v. Roglieri*, No. 1:24-CR-392 (MAD) (N.D.N.Y.), which are entitled to collateral estoppel effect in this proceeding.

## **PROPOSED FINDINGS OF FACT**

### A. Procedural History

1. Defendant filed a voluntary petition for relief under chapter 11, subchapter V, of the Bankruptcy Code on February 15, 2024, commencing Case No. 24-10157-1-rel (the "Bankruptcy Case"). The Bankruptcy Case was subsequently converted to a case under chapter 7 of the Bankruptcy Code on May 15, 2024.

2. Plaintiff commenced this adversary proceeding on April 3, 2024, by filing its Complaint (Adv. Doc. No. 1) (the "Complaint") against Defendant, Prime Commercial Lending, LLC ("Prime Commercial"), Prime Capital Ventures, LLC ("Prime Capital" and, together with Prime Commercial, "Prime"), Kimberly A. Humphrey a/k/a Kimmy Humphrey, also known as Kimberly Owen ("Humphrey"), Erik Martin ("Martin"), and Scott DiBerardinis ("DiBerardinis"). The Complaint asserts five claims for relief: (i) breach of contract against Prime Commercial; (ii) fraudulent inducement against all defendants; (iii) conversion against Prime and Roglieri; (iv) civil RICO under 18 U.S.C. § 1964(c) against Roglieri, Martin, DiBerardinis, and Humphrey; and (v) a determination that Roglieri's debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(4).

3. The Complaint states that the adversary proceeding is commenced pursuant to section 523(c) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 4007 and 7001(6), and that Plaintiff consents to the entry of a final order or judgment by this Court. (Compl. ¶¶ 13–14.)

3

4.      The summons and Complaint were duly and properly served upon Defendant in accordance with Federal Rules of Bankruptcy Procedure 7004(b)(9) and 7004(e) on April 10, 2024 (Adv. Doc. No. 7).

5.      Defendant has never answered the Complaint, moved against it, or otherwise appeared or defended in this adversary proceeding prior to the July 8, 2026 hearing on Plaintiff's motion described below. Defendant accordingly has never filed the responsive statement required by Federal Rule of Bankruptcy Procedure 7012(b) admitting or denying that this proceeding is core or non-core, and has never stated any consent to the entry of final orders or judgment by this Court.

6.      On May 9, 2025, Plaintiff filed a Notice of Voluntary Dismissal (Adv. Doc. No. 17) dismissing without prejudice all of the non-debtor defendants — Prime Commercial, Prime Capital, Humphrey, Martin, and DiBerardinis — pursuant to Federal Rule of Bankruptcy Procedure 7041 and Federal Rule of Civil Procedure 41(a)(1)(A)(i). Defendant Roglieri is the sole remaining defendant.

7.      On July 18, 2025, upon Plaintiff's request, the Clerk of the Court entered the default of Defendant pursuant to Federal Rule of Bankruptcy Procedure 7055 and Federal Rule of Civil Procedure 55(a), Defendant having failed to plead or otherwise defend. (Adv. Doc. No. 29.)

8.      Plaintiff filed the instant motion for default judgment on June 10, 2026 (Adv. Doc. No. 33), supported by the sworn statements, exhibits, and proposed orders and judgments required by Local Bankruptcy Rules 7055-1(d)(1) and 7055-1(d)(2). Because a debtor named as a defendant in an adversary proceeding in his own bankruptcy case is deemed to have appeared for purposes of Federal Rule of Civil Procedure 55, *see In re Emmerling*, 223 B.R. 860, 868–69 (B.A.P. 2d Cir. 1997), Plaintiff served written notice of the motion, with all supporting papers upon Defendant at

4

his address of record and at FCI Danbury (Federal Correctional Institution, Route 37, Danbury, CT 06811) where he is currently incarcerated (Adv. Doc. No. 35). Defendant did not file any written response to the motion. On July 8, 2026, the Court held a hearing on the motion. Defendant appeared telephonically from his place of incarceration, acknowledged that he had received the motion and all supporting papers, and orally requested additional time to respond. The Court, finding no good cause for further delay in a proceeding in which Defendant had defaulted more than a year earlier and had received full and timely notice, denied the request for additional time and granted the motion.

9.    Defendant is an individual who is neither an infant nor an incompetent person. The declaration filed by Plaintiff pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. § 3931 (Adv. Doc. No. 34), establishes that Defendant is not in the military service of the United States; Defendant is presently in the custody of the United States Bureau of Prisons serving the criminal sentence described below.

**B.  The Parties and the Prime Entities**

10.    Plaintiff is a limited liability company formed under the laws of Minnesota and is the owner and developer of a parcel of commercial property in Renville County, Minnesota. In mid-to-late 2023, Plaintiff sought a loan of approximately $100 million to develop and construct a commercial egg production facility on that property. (Compl. ¶¶ 4, 15.)

11.    At all relevant times, Prime Capital, a Delaware limited liability company, and Prime Commercial, a New York limited liability company, were purported commercial lending businesses based in Albany, New York. Defendant, a resident of Warren County, New York, was the Chief Executive Officer and sole member of both entities. (Compl. ¶¶ 5–7; Plea Agreement,

EXHIBIT 1

*United States v. Roglieri*, No. 1:24-CR-392 (MAD) (N.D.N.Y.), Crim. Doc. No. 90 (the "Plea Agreement") ¶ 5(a)(1).)

12.     Defendant and Humphrey founded Prime Capital in December 2021. Humphrey served as Executive Vice President of Prime Capital. Christopher Snyder ("Snyder"), Humphrey's brother, worked for Prime Capital. Martin held himself out as a Vice President of Prime Commercial, and DiBerardinis acted as a representative of both Prime entities. (Compl. ¶¶ 8–10, 25, 31; Plea Agreement ¶¶ 5(a)(2)–(3), 5(b).)

13.     In their communications with Plaintiff and other borrowers, Defendant and his associates failed to distinguish between Prime Commercial and Prime Capital and effectively operated the two entities as one and the same. Defendant was at all relevant times the sole person with access to, and the sole person with the power to transfer or withdraw funds from, the Prime Capital and Prime Commercial bank accounts at KeyBank described below, as Defendant himself testified under oath at the March 14, 2024 meeting of creditors held pursuant to 11 U.S.C. § 341. (Compl. ¶¶ 28, 52.)

## C. The Fraudulent Scheme

14.     Beginning in or about mid-2022 and continuing through at least January 31, 2024, Defendant, together with Humphrey, Snyder, and others, conducted a scheme to defraud commercial borrowers by falsely representing that Prime Capital had the present ability to fund, or to obtain funding for, large commercial loans in the tens of millions of dollars. In truth, as Defendant knew at all relevant times, Prime Capital had obtained no funds of its own and never had the present ability to independently make commercial loans of any size. (Plea Agreement ¶ 5(b); Compl. ¶¶ 1, 17–23.)

EXHIBIT 1

15.      Defendant and Humphrey created a standardized process for extracting money from prospective borrowers. Prime Capital first issued a letter of intent stating the size of the intended loan, and collected a "due diligence" fee, typically $25,000 to $75,000. Prime Capital then signed a line of credit agreement and obtained a large upfront payment denominated an "Interest Credit Account" or "ICA" payment — in some instances as large as $20 million — which Defendant and Humphrey represented would be held in a pledged or segregated account, applied to interest as the loan funded, and fully refunded within a specified timeframe if the contemplated loan did not materialize. (Plea Agreement ¶¶ 5(c)–(e).)

16.      Those representations were false. ICA payments were not deposited into pledged accounts and were not used to cover interest payments on loans; Defendant used portions of ICA payments to fund his own purchases of luxury goods; and Prime Capital did not provide clients with statements showing draws against their ICA payments. As Defendant admitted in the Plea Agreement, his statements to a borrower on a recorded December 2023 call — including that "[t]here really isn't any risk" because "[t]he [ICA] money gets put into a pledged account" — were false and fraudulently omitted material information. (Plea Agreement ¶ 5(e).)

17.      Because Prime Capital never secured any proven, demonstrated, or realized source of loan funding, Defendant and his co-conspirators operated the scheme in the manner of a Ponzi scheme: they used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to, older borrower clients. Defendant also drew on ICA payments to pay his personal debts (including money owed to the Internal Revenue Service), to enrich himself, and to purchase million-dollar vehicles, luxury watches and jewelry, and domestic and international travel by private jet. (Plea Agreement ¶ 5(g).)

7

EXHIBIT 1

18.      Among other examples admitted by Defendant: (a) in June 2022, Prime Capital accepted a $1 million ICA payment from Indigo Pharmaceuticals despite having no ability to fund the $20 million loan Indigo sought; (b) in September 2022, Prime Capital obtained a $20 million ICA payment from Onward Partners, LLC, which Defendant promptly spent and transferred, thereafter using newer clients' ICA payments to return $17 million to Onward between December 2022 and November 2023; (c) in January 2023, Defendant used approximately $3.8 million in due diligence and ICA funds to buy a house in Virginia Beach, Virginia for Humphrey's use; and (d) in September and October 2023, Defendant received and misdirected a $14,249,832 ICA payment from 1322 Developments, LLC, never funded any loan to that client, and never refunded the ICA payment on demand. (Plea Agreement ¶¶ 5(f)–(l).)

19.      To induce victims to deal with Prime, Defendant caused materially false statements to be published over the interstate wires, including statements on Prime's public website that Prime was "A Boutique Investment Bank" with "Over $10 Billion in Transactions Financed"; a public relations newswire and YouTube video touting a purported $188 million loan to ALUX Properties, LLC that was never made; and claims that Prime Capital had funded apartment-complex projects in South Korea for $110 million and $300 million and a $2.3 billion mixed-use project in Dubai, all of which were fabricated. (Compl. ¶¶ 16–23.)

20.      During Defendant's involvement in the conspiracy, more than a dozen victim borrowers paid Prime Capital and Prime Commercial due diligence fees and ICA payments exceeding $50 million based on false representations about Prime Capital's ability to secure funding and false promises that ICA payments would be refundable within a specified timeframe. Defendant obtained $55,484,674.84 in proceeds in connection with his operation of Prime Capital and Prime Commercial. (Plea Agreement ¶¶ 5(p)–(q).)

8

EXHIBIT 1

**D.  The Fraud Perpetrated on Plaintiff**

21.      In mid-to-late 2023, Plaintiff was introduced to Prime through a loan broker. Before doing business with Prime, Jeffery A. Huston, Plaintiff's President, and Plaintiff's loan broker reviewed Prime's website, including the false representations described above, and reasonably relied upon those representations in concluding that Prime appeared to be a legitimate lender. (Compl. ¶¶ 15–16, 24.)

22.      On October 20, 2023, DiBerardinis, purportedly acting through both Prime Commercial and Prime Capital, issued to Plaintiff a "Terms and Contingent Letter of Intent" representing that Prime Capital had the ability to fund a $105 million loan, and contemplating an ICA deposit of $26,277,562. (Compl. ¶ 25.)

23.      On December 12, 2023, Prime Capital issued to Plaintiff a "Commitment to Fund Letter," executed by Defendant on behalf of Prime Capital and countersigned by Mr. Huston on behalf of Plaintiff, in which Prime Capital committed to fund a line of credit in the amount of $98,905,467. (Compl. ¶ 26.)

24.      In emails sent December 11, 15, and 18, 2023, DiBerardinis represented that Plaintiff and Prime needed to "soft close" on the loan transaction prior to the last week of December, intentionally implying that Plaintiff risked losing the deal if it did not. On December 19, 2023, Martin sent Plaintiff an email stating: "If we don't make this soft close happen this week, we may lose the deal altogether. The ICA will jump as well as the rate, and may require a whole new underwrite." These representations were knowingly false and were intended to create a false sense of urgency to induce Plaintiff to consummate a "soft close" and wire the required deposit. (Compl. ¶¶ 29, 31.)

9

EXHIBIT 1

25. Unknown to Plaintiff, on December 19, 2023, certain of Prime Capital's creditors filed an involuntary bankruptcy petition against Prime Capital in this District, *In re Prime Capital Ventures, LLC*, Case No. 23-11302 (Bankr. N.D.N.Y.), and on December 21, 2023, this Court entered an Order Appointing Interim Chapter 7 Trustee in that case. Neither the involuntary petition nor the trustee order was disclosed to Plaintiff until after Plaintiff's deposit was made. As Defendant admitted in the Plea Agreement, Defendant, Humphrey, and Snyder sought Plaintiff's ICA payment even after learning of the involuntary bankruptcy proceeding on December 19, 2023. (Compl. ¶¶ 30, 38; Plea Agreement ¶ 5(m).)

26. Plaintiff, not wanting to lose the potential financing but unwilling to pay the full ICA deposit before closing, negotiated to send a $5,000,000 initial deposit to be held in trust and not used for any other purpose. On December 21, 2023, Humphrey emailed Mr. Huston a draft "Deposit Agreement" between Plaintiff and Prime Commercial, attaching wire instructions for an account at KeyBank that Humphrey represented was held in the name of Prime Commercial. (Compl. ¶¶ 32–33.)

27. Plaintiff's counsel revised the proposed Deposit Agreement to ensure that the $5,000,000 deposit would be held in trust and not used for any other purpose. On December 22, 2023, the Deposit Agreement was executed by Defendant on behalf of Prime Commercial and by Plaintiff. The agreement was prepared by Snyder. (Compl. ¶¶ 34–35; Plea Agreement ¶¶ 5(m)–(n).)

28. The Deposit Agreement provides in relevant part:

> The Lender [Prime Commercial Lending, LLC] hereby acknowledges receipt of such funds and agrees to hold the Deposit Amount in a separate and distinct account for Borrower, subject to the terms and conditions of this Agreement. The Deposit Amount should be held as a trust fund and shall not be subject to any lien,

EXHIBIT 1

> attachment, trustee process or any other judicial process of any
> creditor of any party hereto.

(Deposit Agreement § 2.a; Compl. ¶ 36.) As Defendant admitted in the Plea Agreement, Plaintiff

made its $5 million ICA payment based on Defendant's false contractual promise that the funds

would be kept in a "separate and distinct account" and would be "refundable" if Prime Capital and

Plaintiff did not enter into an agreement for an approximately $100 million line of credit. (Plea

Agreement ¶ 5(m).)

29.     In accordance with the Deposit Agreement, on December 22, 2023, Plaintiff wired

$5,000,000 to the KeyBank account designated in the wire instructions provided by Humphrey.

Contrary to Humphrey's and Defendant's representations, that account (account no. xxxx2233)

was not held in the name of Prime Commercial; it was held in the name of Prime Capital — the

entity then in an involuntary bankruptcy proceeding and subject to this Court's trustee order —

and was controlled by Defendant. The account held a balance of $1,923.66 immediately before

Plaintiff's wire. (Compl. ¶¶ 37, 40; Plea Agreement ¶ 5(n).)

30.     By letter dated January 3, 2024, sent pursuant to the notice provisions of the Deposit

Agreement, Plaintiff formally demanded return of its $5,000,000. DiBerardinis acknowledged

receipt of the demand letter by email that same day. Despite repeated demands, no portion of

Plaintiff's $5,000,000 has ever been returned. (Compl. ¶¶ 39, 47.)

**E.  Defendant's Immediate Misappropriation of the Entrusted Funds**

31.     Defendant never held Plaintiff's $5,000,000 deposit in trust. On December 22, 2023

— the same day Plaintiff's wire was received — Defendant transferred the entire $5,000,000 by

internet transfer out of the Prime Capital account, in direct violation of this Court's trustee order

in the Prime Capital bankruptcy case, and into a KeyBank account ending xxxx4465 held in the

11

EXHIBIT 1

name of Prime Commercial, which had an ending balance of $57,045.90 the day before. (Compl. ¶¶ 40–42.)

32.    As Defendant admitted in the Plea Agreement, Defendant "then transferred, stole, and fraudulently used the funds by initiating wire transfers over the Internet from his home in Warren County to KeyBank servers in Ohio," including: (a) on December 22, 2023, a transfer of $950,000 to an existing Prime Capital client in Saratoga County, New York, as partial loan funding for that client's unrelated real estate project; (b) on December 26, 2023, a payment of $101,000 for round-trip private air travel between Albany International Airport and Anguilla for a family vacation; and (c) on December 26, 2023, a payment of $84,000 for a Rolex day-date yellow gold diamond bezel watch. (Plea Agreement ¶ 5(o).)

33.    The December 2023 account statements further show that, immediately upon receipt, Defendant dissipated the balance of Plaintiff's trust funds, including a $2,000,000 wire to "CPH LLC" on December 22, 2023, and wires to the law firms representing Prime Capital in litigation — all unauthorized uses directly contrary to the trust provisions of the Deposit Agreement. (Compl. ¶¶ 42–46, 48.)

**F. Defendant's Criminal Conviction for the Same Conduct**

34.    A federal grand jury returned a superseding indictment against Defendant in *United States v. Roglieri*, No. 1:24-CR-392 (MAD) (N.D.N.Y.) (the "Criminal Case"), charging offenses arising out of the fraudulent scheme described above, including wire fraud. The fraud perpetrated against Plaintiff is expressly described in the factual basis of Defendant's plea. (Plea Agreement ¶¶ 5(m)–(o).)

35.    On October 31, 2025, Defendant executed the Plea Agreement, and on November 13, 2025, Defendant pleaded guilty before the Honorable Mae A. D'Agostino, United States

12

EXHIBIT 1

District Judge, to Count 1 of the superseding indictment, charging conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 1343. (Crim. Doc. No. 90; Am. J., Crim. Doc. No. 132, at 1.)

36.    In the Plea Agreement, Defendant admitted, among other things, each of the facts recited in Findings 14 through 31 above, including specifically that he, Humphrey, and Snyder "fraudulently obtained a $5 million ICA payment from 1800 Park Avenue LLC," that Plaintiff made the payment based on Defendant's false contractual promises, that the payment was made to an account Defendant controlled, and that Defendant "transferred, stole, and fraudulently used the funds." (Plea Agreement ¶¶ 5(m)–(o).) Defendant further admitted that two or more persons conspired to knowingly and willfully participate in a scheme to defraud or to obtain money by materially false and fraudulent pretenses, representations, or promises, with knowledge of the scheme's fraudulent nature and specific intent to defraud, reasonably foreseeing the use of interstate wires in furtherance of the scheme, and that he joined that conspiracy knowing its purpose and intending to help it succeed. (Plea Agreement ¶ 4.)

37.    On April 3, 2026, the District Court sentenced Defendant to, among other things, 97 months' imprisonment and three years of supervised release. On May 5, 2026, the District Court entered an Amended Judgment in the Criminal Case (Crim. Doc. No. 132) (the "Criminal Judgment"), adjudicating Defendant guilty of conspiracy to commit wire fraud and ordering restitution in the total amount of $31,280,426 to nine victims pursuant to 18 U.S.C. §§ 3663 and 3663A. The restitution schedule identifies Plaintiff, "1800 Park Avenue LLC," as a victim of Defendant's offense and orders restitution to Plaintiff in the amount of $5,875,000, jointly and severally with co-defendants Kimberly Owen (No. 1:25-CR-238) and Christopher Snyder (No. 1:25-CR-195). The Criminal Judgment also effectuates Defendant's forfeiture, including a money

judgment of $55,484,674.84 consented to in the Plea Agreement. (Crim. Doc. No. 132, at 6–7; Plea Agreement ¶ 1(e).)

38.    Defendant's conviction is final. Defendant waived his rights to appeal and collaterally attack, among other things, the conviction resulting from his guilty plea, any term of imprisonment of 70 months or less, and any order of restitution consistent with the Plea Agreement (Plea Agreement ¶ 7).

**G.  Plaintiff's Damages**

39.    As a direct and proximate result of the conduct described above, Plaintiff was injured in its business and property in the amount of $5,000,000 — the trust deposit Plaintiff wired on December 22, 2023 in reasonable reliance on Defendant's false representations and false contractual promises, which Defendant immediately misappropriated and has never returned.

40.    Plaintiff has also incurred attorneys' fees and costs in prosecuting this action. As established by the declaration of Chad P. Miesen and the contemporaneous billing records submitted therewith (Adv. Doc. No. 34), Plaintiff has incurred reasonable attorneys' fees of $156,440.00 and costs of $1,094.10 in connection with this proceeding and the underlying fraudulent acts of Defendant.

41.    As of the date hereof, Plaintiff has received no restitution payments under the Criminal Judgment. Any amounts Plaintiff actually receives in restitution on account of its loss will reduce, dollar for dollar, the unpaid compensatory portion of the judgment recommended herein, so that Plaintiff does not obtain a double recovery of its actual loss.

EXHIBIT 1

## PROPOSED CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and Adjudicatory Authority

1.      The District Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), as a civil proceeding arising under title 11, or arising in or related to a case under title 11. This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the standing order of reference of the United States District Court for the Northern District of New York. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

2.      This Court has personal jurisdiction over Defendant, who is the debtor in the underlying Bankruptcy Case, resides in this District, and was properly served with the summons and Complaint pursuant to Federal Rules of Bankruptcy Procedure 7004(b)(9) and 7004(e).

3.      The Fifth Claim for Relief, seeking a determination that Defendant's debt to Plaintiff is excepted from discharge under 11 U.S.C. § 523(a)(4), is a core proceeding. 28 U.S.C. § 157(b)(2)(I). This Court has both statutory and constitutional authority to enter a final judgment on the Fifth Claim for Relief, which invokes a substantive right created by the Bankruptcy Code and arises only in the context of a bankruptcy case.

4.      The Fourth Claim for Relief, asserting a civil RICO claim under 18 U.S.C. § 1964(c), is a non-core claim that is otherwise related to the Bankruptcy Case. A civil RICO claim does not invoke a substantive right provided by the Bankruptcy Code and exists entirely independent of any bankruptcy filing. *See Reiner v. Paneth*, 740 F. Supp. 3d 303 (E.D.N.Y. 2024) (RICO claims asserted in an adversary proceeding are non-core); *Adelphia Commc'ns Corp. v. Rigas*, No. 02 Civ. 8495 (GBD), 2003 WL 21297258, at 2–3 (S.D.N.Y. June 4, 2003) (same); *In re Laventhol & Horwath*, 139 B.R. 109 (S.D.N.Y. 1992); *Barnett v. Stern\**, 909 F.2d 973, 979–81 (7th Cir. 1990).

15

EXHIBIT 1

5.    In addition, a civil RICO claim is a private right that does not stem from the bankruptcy itself and would not necessarily be resolved in the claims allowance process. Accordingly, absent the knowing and voluntary consent of the parties, this Court lacks constitutional authority to enter final judgment on the Fourth Claim for Relief. *Stern v. Marshall*, 564 U.S. 462 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015) (consent to bankruptcy court adjudication of a *Stern* claim must be "knowing and voluntary"); *Reiner*, 740 F. Supp. 3d at 314–16.

6.    Although Plaintiff has expressly consented to this Court's entry of final orders and judgment (Compl. ¶ 14), Defendant did not appear in this adversary proceeding until the July 8, 2026 hearing on the motion, at which he appeared telephonically solely to request additional time to respond; he has never filed the statement required by Federal Rule of Bankruptcy Procedure 7012(b), and has taken no action in this adversary proceeding from which knowing and voluntary consent could be inferred. The Court therefore declines to treat Defendant's default as consent to this Court's final adjudication of the non-core RICO claim.

7.    Accordingly, with respect to the Fourth Claim for Relief, this Court proceeds under 28 U.S.C. § 157(c)(1): the Court has heard the proceeding and hereby submits these proposed findings of fact and conclusions of law to the District Court, and any final order or judgment on the Fourth Claim for Relief shall be entered by the District Court after considering these proposed findings and conclusions and after reviewing de novo those matters to which any party timely and specifically objects. *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033; *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34–40 (2014) (where a *Stern* claim may not be finally adjudicated by the bankruptcy court, the proper course is to treat the claim as non-core and proceed under § 157(c)(1)).

16

## B.  Standards Governing Default Judgment

8.      Federal Rule of Civil Procedure 55, made applicable by Federal Rule of Bankruptcy

Procedure 7055, establishes a two-step process: entry of default by the clerk, followed by entry of

default judgment. The Clerk entered Defendant's default on July 18, 2025. (Adv. Doc. No. 29.)

9.      By virtue of his default, Defendant is deemed to have admitted all well-pleaded

factual allegations of the Complaint pertaining to liability. *Greyhound Exhibitgroup, Inc. v.*

*E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Au Bon Pain Corp. v. Artect, Inc.*, 653

F.2d 61, 65 (2d Cir. 1981). A default is not an absolute confession of liability, however; the Court

must still determine whether the well-pleaded allegations state a claim upon which relief may be

granted. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011). As set

forth below, they do.

10.     Allegations relating to the amount of damages are not deemed admitted and must

be established by the plaintiff. *Greyhound*, 973 F.2d at 158. The Court may determine damages

without an evidentiary hearing where, as here, the record — including detailed affidavits,

documentary evidence, and the admissions in Defendant's own plea agreement and the restitution

findings in the Criminal Judgment — provides a sufficient basis to ascertain damages with

reasonable certainty. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d

105, 111 (2d Cir. 1997); *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

Plaintiff's actual damages here are fixed, liquidated, and indisputable: a single $5,000,000 wire

transfer that was never returned.

## C.  Collateral Estoppel Effect of Defendant's Criminal Conviction

11.     Independent of the default, Defendant is collaterally estopped from contesting the

facts established by his criminal conviction. It is well settled in the Second Circuit that "a criminal

17

conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case," and the same preclusive effect is available to private plaintiffs. *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978); *see Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986); *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568–69 (1951).

12. Collateral estoppel principles apply in nondischargeability proceedings under 11 U.S.C. § 523(a). *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991); *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006).

13. Defendant pleaded guilty to conspiracy to commit wire fraud and, in doing so, expressly admitted under oath the specific facts of the fraud perpetrated on Plaintiff, including the false representations, the false contractual promise that Plaintiff's $5 million would be held in a separate and distinct account, the receipt of Plaintiff's wire into an account he controlled, and his theft and fraudulent use of the funds. (Plea Agreement ¶¶ 4, 5(m)–(o).) Those issues were necessarily determined by, and were essential to, the judgment of conviction, and Defendant had a full and fair opportunity to litigate them. Defendant is therefore precluded from relitigating them here.

**D. The Fourth Claim for Relief: Civil RICO, 18 U.S.C. §§ 1962(c), 1964(c)**

14. RICO's civil remedies provision affords a cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962," and provides that such a person "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

EXHIBIT 1

activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). Each element is satisfied.

15.     *Person.* Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

16.     *Enterprise.* The well-pleaded allegations establish an association-in-fact enterprise consisting of Defendant, Humphrey, Snyder, Martin, DiBerardinis, Prime Capital, and Prime Commercial (the "Enterprise"), possessing the three structural features required by *Boyle v. United States*, 556 U.S. 938, 946 (2009): a common purpose (obtaining due diligence fees and ICA payments from borrowers through fraud), relationships among those associated with the Enterprise (a coordinated operation run through the Prime entities by Defendant and his associates), and longevity sufficient to pursue the Enterprise's purpose (an operation spanning from at least mid-2022 into 2024). (Compl. ¶¶ 74–76.) Alternatively, Prime Capital itself constitutes the enterprise; Defendant, as its chief executive officer and sole member, is legally distinct from the entity and may be held liable under § 1962(c) for conducting its affairs. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). The Enterprise engaged in, and its activities affected, interstate commerce: it solicited victims across multiple states, moved tens of millions of dollars through interstate wire transfers and federally regulated financial institutions, and injured Plaintiff's development of a Minnesota commercial facility. (Compl. ¶¶ 74–75.)

17.     *Conduct.* Defendant did not merely participate in the Enterprise; he directed it. Defendant was the CEO and sole member of both Prime entities, signed the letters of intent, commitment letters, and deposit agreements, controlled the bank accounts, and personally initiated the transfers by which victim funds — including Plaintiff's — were misappropriated. Defendant plainly "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

EXHIBIT 1

18.     *Racketeering activity.* "Racketeering activity" includes any act indictable under 18 U.S.C. § 1343 (wire fraud). 18 U.S.C. § 1961(1)(B). The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). The record — both the admitted allegations and Defendant's plea admissions — establishes far more than the two predicate acts required by 18 U.S.C. § 1961(5), including, as to Plaintiff alone: (a) the interstate publication of materially false statements concerning Prime's lending history and capacity on Prime's website and in press materials; (b) the December 11, 15, 18, and 19, 2023 emails creating a false sense of urgency to induce Plaintiff's deposit; (c) Humphrey's December 21, 2023 email transmitting the Deposit Agreement and falsified wire instructions; (d) the December 22, 2023 receipt of Plaintiff's $5,000,000 interstate wire transfer procured by fraud; and (e) the December 22 and 26, 2023 wire transfers Defendant initiated over the internet from New York to KeyBank servers in Ohio to steal and dissipate Plaintiff's funds. (Compl. ¶ 77; Plea Agreement ¶¶ 5(m)–(o).) The record likewise establishes numerous additional predicate acts of wire fraud committed against more than a dozen other victim borrowers between mid-2022 and January 2024, including the Indigo, Onward, and 1322 Developments transactions described above. (Plea Agreement ¶¶ 5(f)–(l), (p).) Each act was committed knowingly, willfully, and with specific intent to defraud, as Defendant has admitted. (Plea Agreement ¶¶ 4–5.)

19.     *Pattern.* A pattern of racketeering activity requires at least two predicate acts within ten years, 18 U.S.C. § 1961(5), that are related and that amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The predicate acts here are plainly related: they share the same purpose (extracting fees and ICA payments by fraud), the same methods (false representations of lending capacity, false promises of segregated

20

EXHIBIT 1

and refundable deposits, and false urgency), the same participants, and similar victims. *Id.* at 240.

Continuity is established on a closed-ended basis: the predicate acts span from at least mid-2022

through at least January 31, 2024 — a period approaching two years — and comprise scores of

fraudulent wire transmissions directed at more than a dozen separate victims who paid more than

$50 million. While the Second Circuit treats two years as a guidepost for closed-ended continuity,

it is not a bright-line rule; courts also weigh the number and variety of predicate acts, the number

of victims, and the number of separate schemes. *Spool v. World Child Int'l Adoption Agency*, 520

F.3d 178, 184 (2d Cir. 2008); *DeFalco*, 244 F.3d at 321; *Cofacredit, S.A. v. Windsor Plumbing

Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999); *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67

F.3d 463, 467–68 (2d Cir. 1995). The extensive duration, the multiplicity of victims and fraudulent

transactions, and the scheme's continuous operation as the Enterprise's regular way of doing

business amply establish continuity here.

20.     *Injury and causation.* Plaintiff was injured in its business and property — the loss

of its $5,000,000 deposit — by reason of Defendant's violation of § 1962(c). The predicate acts of

wire fraud were directed at Plaintiff, Plaintiff relied on the misrepresentations, and Plaintiff's loss

was the direct, foreseeable, and intended consequence of the scheme. The requirements of

proximate causation are readily met. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992);

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649–55 (2008).

21.     Accordingly, the well-pleaded allegations of the Complaint, deemed admitted by

Defendant's default and independently confirmed by Defendant's criminal conviction and plea

admissions, establish Defendant's liability to Plaintiff under 18 U.S.C. §§ 1962(c) and 1964(c).

21

EXHIBIT 1

**E. Damages on the Fourth Claim for Relief**

22. Plaintiff sustained actual damages of $5,000,000. That sum is established with certainty by the documentary record, is corroborated by Defendant's plea admissions, and is consistent with the Criminal Judgment's identification of Plaintiff as a victim of the offense of conviction.

23. Trebling is mandatory: a person injured by reason of a § 1962 violation "shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c). Plaintiff is therefore entitled to judgment in the amount of $15,000,000 on the Fourth Claim for Relief.

24. Section 1964(c) likewise mandates an award of "the cost of the suit, including a reasonable attorney's fee." Based on the declaration of Chad P. Miesen and the contemporaneous billing records submitted therewith, and applying the lodestar method, the Court concludes that attorneys' fees of $156,440.00 and costs of $1,094.10 are reasonable and were necessarily incurred, and recommends that they be awarded.

25. The Court further recommends that Plaintiff be awarded prejudgment interest on its actual (untrebled) damages of $5,000,000 from December 22, 2023 through the date of entry of judgment, at such rate as the District Court deems appropriate, the award and rate of prejudgment interest being matters committed to the District Court's discretion. *See Wickham Contracting Co. v. Local Union No. 3, IBEW*, 955 F.2d 831, 833–35 (2d Cir. 1992). Post-judgment interest shall accrue as of right pursuant to 28 U.S.C. § 1961.

26. Restitution and civil damages serve distinct purposes, and the entry of the restitution order in the Criminal Case does not bar entry of a civil judgment for the same loss; however, Plaintiff may not obtain a double recovery of its actual loss. The judgment should accordingly provide that any restitution payments Plaintiff actually receives in the Criminal Case

22

on account of its loss shall be credited against the unpaid compensatory portion of the civil

judgment, and any payments on the compensatory portion of the civil judgment shall likewise be

credited against Defendant's restitution obligation to Plaintiff, in accordance with the single-

satisfaction rule.

**F.  The Fifth Claim for Relief: Nondischargeability Under 11 U.S.C. § 523(a)(4)**

27.     Section 523(a)(4) of the Bankruptcy Code excepts from an individual debtor's

chapter 7 discharge under 11 U.S.C. § 727 "any debt . . . for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Embezzlement and larceny

under § 523(a)(4) do not require that the debtor have acted in a fiduciary capacity. Plaintiff bears

the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291

(1991).

28.     *Embezzlement.* Embezzlement is "the fraudulent appropriation of property by a

person to whom such property has been intrusted, or into whose hands it has lawfully come."

*Moore v. United States*, 160 U.S. 268, 269 (1895). A creditor must show that (1) the debtor

rightfully possessed the creditor's property, (2) the debtor appropriated the property for a use other

than that for which it was entrusted, and (3) the circumstances indicate fraud. Each element is

established. Plaintiff entrusted $5,000,000 to Defendant's entity pursuant to a written agreement,

executed by Defendant personally, that required the funds to be held "as a trust fund" in a "separate

and distinct account" for Plaintiff. Defendant — the sole person with access to and control over

the receiving account — immediately appropriated the entrusted funds to uses flatly inconsistent

with the entrustment: funding an unrelated client's project, paying litigation counsel, chartering a

private jet for a family vacation, and buying an $84,000 Rolex. The circumstances overwhelmingly

23

indicate fraud, and indeed Defendant has admitted under oath that he "transferred, stole, and fraudulently used the funds." (Plea Agreement ¶ 5(o).)

29.    *Larceny.* Larceny under § 523(a)(4) is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use without the owner's consent, where the wrongful intent exists at the time of the taking. Defendant's own admissions establish that Plaintiff's deposit was "fraudulently obtained" from the outset — procured by a contractual promise Defendant never intended to honor, made days after Defendant learned that Prime Capital had been placed into an involuntary bankruptcy — and was stolen the very day it was received. (Plea Agreement ¶¶ 5(m)–(o).) The debt is therefore also one for larceny.

30.    *Fiduciary defalcation.* Independently, the Deposit Agreement created an express trust — with an identified res ($5,000,000), an identified beneficiary (Plaintiff), and express trust duties (segregation and safekeeping) — that arose before and without reference to the wrongdoing. Defendant, who executed the agreement and exercised sole control over the entrusted funds, acted in a fiduciary capacity with respect to them, and his intentional misappropriation of the entire res constitutes fraud or defalcation with the culpable state of mind required by *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–75 (2013). The Court need not rest on this ground, however, because the embezzlement and larceny prongs are independently dispositive.

31.    The exception from discharge extends to the entire debt arising from Defendant's conduct, not merely the $5,000,000 actually taken. In *Cohen v. de la Cruz*, 523 U.S. 213, 218–23 (1998), the Supreme Court held that the exceptions in § 523(a) bar discharge of "all liability arising from" the proscribed conduct, including treble damages, attorneys' fees, and costs awarded on account of that conduct. *Cohen* itself enforced an award of treble damages, and its reasoning applies with equal force to the parallel "any debt . . . for" language of § 523(a)(4). Accordingly,

the entirety of the judgment to be entered on the Fourth Claim for Relief — compensatory damages as trebled, attorneys' fees, costs, and interest — constitutes a debt for embezzlement and larceny (and for fraud or defalcation while acting in a fiduciary capacity) that is excepted from Defendant's discharge under 11 U.S.C. § 523(a)(4).

32.    Because the Fifth Claim for Relief is a core proceeding, this Court will enter a separate final judgment determining that Defendant's debt to Plaintiff arising from the conduct described herein — in the amount finally liquidated by the District Court's judgment on the Fourth Claim for Relief, together with all interest accruing thereon — is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

**G.  The Remaining Claims for Relief**

33.    The First Claim for Relief was asserted only against Prime Commercial, which has been dismissed from this proceeding. The Second Claim for Relief (fraudulent inducement) and Third Claim for Relief (conversion) seek recovery of the same $5,000,000 actual loss that is fully compensated — and trebled — by the judgment recommended on the Fourth Claim for Relief. Plaintiff does not seek duplicative recovery, and the Court recommends that the Second and Third Claims for Relief be dismissed as moot, without prejudice, upon entry of final judgment on the Fourth Claim for Relief.

**<u>RECOMMENDED DISPOSITION</u>**

For the foregoing reasons, the Court respectfully recommends that the District Court, after the objection period provided by Federal Rule of Bankruptcy Procedure 9033 and de novo review of any matters to which timely and specific objection is made:

    a.    ADOPT these proposed findings of fact and conclusions of law;

25

b.    GRANT Plaintiff's motion for default judgment on the Fourth Claim for Relief and ENTER JUDGMENT in favor of Plaintiff 1800 Park Avenue LLC and against Defendant Kris Daniel Roglieri in the amount of $15,000,000, representing Plaintiff's actual damages of $5,000,000 trebled pursuant to 18 U.S.C. § 1964(c);

c.    AWARD Plaintiff its reasonable attorneys' fees of $156,440.00 and costs of $1,094.10 pursuant to 18 U.S.C. § 1964(c);

d.    AWARD Plaintiff prejudgment interest on its actual damages of $5,000,000 from December 22, 2023 through the date of entry of judgment at such rate as the District Court deems appropriate, with post-judgment interest to accrue pursuant to 28 U.S.C. § 1961;

e.    PROVIDE that any restitution payments Plaintiff actually receives in *United States v. Roglieri*, No. 1:24-CR-392 (MAD) (N.D.N.Y.), on account of its loss shall be credited against the unpaid compensatory portion of the judgment, and vice versa, to prevent double recovery of Plaintiff's actual loss; and

f.    DISMISS the Second and Third Claims for Relief as moot, without prejudice.

The Court further states its intention, upon the District Court's entry of final judgment on the Fourth Claim for Relief, to enter a separate final judgment on the Fifth Claim for Relief determining that the debt evidenced by that judgment is excepted from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(4).

## NOTICE PURSUANT TO FED. R. BANKR. P. 9033

The Clerk of this Court shall serve forthwith copies of these proposed findings of fact and conclusions of law on Plaintiff (through counsel) and on Defendant at his address of record and at FCI Danbury (Federal Correctional Institution, Route 37, Danbury, CT 06811) where he is

EXHIBIT 1

currently incarcerated, and shall transmit them to the United States District Court for the Northern

District of New York in accordance with Federal Rule of Bankruptcy Procedure 9033(a) and (d).

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Bankruptcy Procedure 9033(b),

within 14 days after being served with a copy of these proposed findings of fact and conclusions

of law, a party may serve and file with the Clerk written objections that identify the specific

proposed findings or conclusions objected to and state the grounds for the objection. A party may

respond to another party's objections within 14 days after being served with a copy thereof. The

district judge shall make a de novo review upon the record of any portion of these proposed

findings and conclusions to which specific written objection has been made. Fed. R. Bankr. P.

9033(d). Failure to file timely and specific objections may result in the waiver of the right to

review.


# # #

27

EXHIBIT 1

EXHIBIT 1